OPINION. Black, Judge: We shall take up and discuss the issues in the same order as they appear in our preliminary statement, except issue 1 will be passed over until issue 2 has been decided. Respondent has determined in his deficiency notice that the transfer from Convair to Nashville was a taxable transaction and petitioner does not dispute this, except in the alternative. Issue 2. The deficiencies involved herein arise from the respondent’s determination that the basis of assets acquired by Nashville in exchange for its capital stock was $13,526,440.63. The respondent contends that Nashville acquired the assets in a taxable transaction and therefore did not acquire its predecessor’s basis; that their basis was cost; that the cost of the assets was the fair market value of Nashville’s stock that was given in exchange for the assets, plus liabilities assumed; and that the fair market value of Nashville’s stock was the price that Convair’s shareholders paid Convair for it pursuant to the agreement of sale. He then contends that the cost thus arrived at should be allocated among the various assets according to tbeir relative value and that the basis so determined should be used in determining profit or loss upon disposition of any of the assets and in determining depreciation. The petitioner contends that the sale of Nashville’s stock to Con-vair’s shareholders pursuant to the agreement of sale did not reflect the fair market value of that stock because it was not an arm’s-length transaction but, on the contrary, was between parties of interrelated interests; that the fair market value of Nashville’s stock was the fair market value of the assets received by Nashville in exchange for the stock; that the fair market value of the assets was not less than their book value; and that, assuming the respondent’s determination as to the basis (cost) of the group of assets is correct, his allocation among the various assets, namely, the current assets, is incorrect. In the alternative, it contends that Nashville acquired the assets in a nontaxable exchange and therefore it acquired its predecessor’s (Con-vair’s) basis. Petitioner, in its brief, states that it only presses this alternative contention in the event that the Tax Court fails to support its contention as to the fair market value of the assets at the time they were transferred and that that was their cost basis to petitioner. Assuming that the transfer from Convair to Nashville was a taxable exchange, as we do for the purpose of this discussion, the basis of the assets received by Nashville is cost, sec. 113 (a), I. R. C. 1939, and cost is the fair market value of the stock that Nashville gave in exchange for those assets. Ambassador Petroleum. Co., 28 B. T. A. 868, 873 (1933), reversed on another issue 81 F. 2d 474 (C. A. 9, 1936); but cf. Philadelphia Park Amusement Co. v. United States, (Ct. Cl., 1954) 126 F. Supp. 184, 187-189. The determination of fair market value is one of fact. Estate of Leonard B. McKitterick, 42 B. T. A. 130, 136 (1940). Sales on the open market are usually reliable as evidence of fair market value of the stock. John J. Newberry, 39 B. T. A. 1123, 1129 (1939). However, in the case of a newly formed corporation, where there are no such sales, the fair market value of the assets received in exchange for the stock is usually considered to be the best evidence of the fair market value of the stock. Gillette Rubber Co., 31 B. T. A. 483 (1934), and cases cited therein. The crux of the respondent’s position is that the sale of Nashville’s stock by Convair to Convair’s shareholders pursuant to the agreement of sale was an arm’s-length transaction and that there is no need to look to the value of the assets received by Nashville because that sale reflects the fair market value of the stock. We are convinced that the agreement of sale did not reflect the fair market value of the Nashville stock. The sale was restricted to the Convair stockholders. That is plain from the facts in the record. The stock was offered to them so that they could maintain their relative interest in the assets that were transferred to Nashville. The subscription warrants givemto the Convair shareholders were only good for 21 days and were probably difficult to sell because they would be valueless to anyone who did not own Convair’s stock. (Convair’s stock was part of the purchase price of Nashville’s stock.) A sale so restricted cannot be said to be the best evidence of the fair market value of Nashville’s stock. Cf. Gillette Rubber Co., supra. Undoubtedly the sale was fair to the stockholders inter se but it would have been fair to them regardless of the price paid by them so long as they all had equal rights. The fact that Atlas agreed not to subscribe does not indicate that the purchase price equaled fair market value. As a consequence of the sale, Atlas’s interest in Convair increased to 10 per cent and it came into control of Convair as Avco bowed out. That was in accordance with the agreement and understanding of the parties. Unquestionably its action in agreeing to the sale and refraining from exercising its subscription warrants was motivated by its desire to gain control of Convair despite its relatively small holdings. The fact that very few of the other shareholders exercised their warrants is likewise not an indication that the purchase price was indicative of fair market value. They were required to put up cash plus some of their Convair shares in order to obtain the shares of Nashville. Those factors doubtless acted as a deterrent to their purchasing the Nashville stock. At any rate, the facts show that Avco purchased its quota of Nashville’s stock and also purchased the remainder, while most of the other stockholders of Convair did not exercise their rights under the warrants which they received. Since the contract purchase price for Nashville’s stock did not reflect the fair market value of that stock we should look to the fair market value of the assets received by Nashville as evidencing the fair market value of the stock. Gillette Rubber Co., supra; C. D. Johnson-Lumber Corporation, 12 T. C. 348, 363 (1949). The petitioner contends that the fair market value of those assets is not less than their book value. We think the evidence regarding those assets sustains the petitioner’s contention. We think that under the evidence the current assets were clearly worth their book value. Substantially all of the accounts receivable were due from affiliated solvent corporations whose stock was listed on the New York Stock Exchange. The inventories were valued at the lower of cost or market and were to be used in fulfilling firm contracts (some of which were cost-plus contracts) with those same affiliated corporations. See Newberry Lumber & Chemical Co., 33 B. T. A. 150, 155 (1935). Some of the contracts were in technical default but the parties favored waiving the existing defaults and settling the claims on a fair and equitable basis. Also, the fact that the accounts receivable and inventories were later disposed of at face value in the normal course of business is not without significance. Cf. Frischkorn Development Co., 30 B. T. A. 8,13 (1934), affd. 88 F. 2d 1009 (C. A. 6, 1937). The fixed assets were recorded on the books at cost less depreciation. The reproduction cost of the plant had risen over 50 per cent between the early 1940’s, when the plant was built, and 1947. A substantial portion of the machinery was installed in the 2 years prior to the closing date of the sale. These facts, plus the opinion evidence, are good indications that the fair market value of these assets was not less than their book value (cost less depreciation). The securities of ACF-Brill and Eastern were recorded on the books of Nashville at the quoted market value at the closing date of the sale. Also the securities of ACF-Brill represented control of that corporation. The fact that the stock of some of the affiliated corporations involved was selling at less than book value on the various stock exchanges does not require a finding that the fair market value of the Nashville stock was less than book value. In this instance Avco was gaining control of Nashville in addition to the fact that Nashville had assets with a fair market value equal to book value. As to issue 2, we sustain the petitioner. Having found for the petitioner on the valuation question there is no need to consider its alternative contention embodied in issue 1. Also it becomes unnecessary to consider issue 3, which deals with the Commissioner’s allocation of $13,526,440.63 alleged costs between the different assets which Convair conveyed to Nashville. As to issue 4, dealing with net operating losses for the taxable periods ending November 30,1948, and April 20,1949, the parties seem to agree that the amount of the net operating losses, if any, to which Nashville is entitled will be determined by our Court’s decision on the main issue as to the cost basis of the assets which Nashville acquired from Convair. Decision will be entered wider Rule 50.